IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CAMERON CHAMPION, | : |
| JEREMY CICCONE, | : |
| EMILY FLETTY, | : |
| SHERRIE FRENCH, | : Case No. _____ |
| LEVENT HAMDEMIR, | : |
| ETHAN PARISH, and | : COMPLAINT |
| MARY RACHIDE, | : |
| | : JURY TRIAL DEMANDED |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| WILLIAM "BEAU" WRIGLEY IV, | : |
| | : |
| Defendant. | : |

## <u>COMPLAINT</u>

COME NOW the above-named Plaintiffs, former employees of Surterra Wellness and, later, Parallel, a medical marijuana company that was targeted and acquired by William "Beau" Wrigley IV. As a result of a fraudulent compensation scheme developed and peddled by Wrigley and his agents, including Stevens Sainte-Rose, Plaintiffs were not given what they were promised but were still taxed like they had been. Wrigley's decision to acquire their employer has had disastrous financial consequences for Plaintiffs, who, unlike investors, had no choice on whether to do business with Wrigley. Wrigley is still a billionaire, and

Plaintiffs continue to hold the bag of devastating financial consequences that he left behind.

## PARTIES

1.

Plaintiff Cameron Champion is the former Executive Director.

2.

Plaintiff Jeremy Ciccone is the former IT Director of Marketing, E-Commerce, and Sales.

3.

Plaintiff Emily Fletty is the former Senior Vice President of Human Resources.

4.

Plaintiff Sherrie French is the former Director of Functional Training.

5.

Plaintiff Levent Hamdemir is the former Chief Marketing & Sales Officer.

6.

Plaintiff Ethan Parish is the former Physical Security Technician Specialist.

7.

Plaintiff Mary Rachide is the former President of New Ventures.

8.

Plaintiffs are citizens of the United States and submit themselves to the jurisdiction of this Court.

9.

This Court has jurisdiction.

## JURISDICTION AND VENUE

10.

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).

11.

Plaintiffs assert claims under the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("Federal RICO Act"), the Internal Revenue Code, 26 U.S.C. § 7434 ("IRC"), Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-1 et seq. ("Georgia RICO Act"), and Georgia state tort law.

12.

Pursuant to 28 U.S.C. § 1391(b) and N.D. Ga. L.R. 3.1, the Atlanta Division of this Court is the proper venue for Plaintiffs' claims because Defendant is subject

to this Court's personal jurisdiction, 28 U.S.C. § 1391(c)(2), and a substantial part of the events or omissions giving rise to the claim occurred within the Atlanta Division of this Court. *See also* N.D. Ga. L.R. 3.1(B)(3).

## BEAU WRIGLEY'S TAKEOVER OF PARALLEL

13.

In late 2018, Wrigley took over as controlling shareholder of Surterra Wellness, an Atlanta-based marijuana company.

14.

Shortly after Wrigley took control of the company, he asserted that the value of the shares skyrocketed from around $1.00 per share to more than $30.00 per share due to the association of his name and connections with the company.

15.

Wrigley had day-to-day control over the operations of the company along with its direction, strategy, finances, and interviewing, hiring, and compensation of employees.

16.

Wrigley touted partnerships, relationships, contracts, acquisitions, and other circumstances to make lofty promises about the financial health and outlook of the company.

4

17.

To attract and retain executives from higher paying jobs, Wrigley used purported stock and options as a promise of future compensation.

18.

Wrigley emailed and otherwise interacted with employees directly about the terms of their compensation packages and value of the company's shares.

19.

Wrigley directly approved changes to the company's compensation plan, including how and when shares or options were granted to or clawed back from employees.

20.

Surterra employees, including Plaintiffs, trusted Wrigley – a successful billionaire who was CEO of the Wrigley Company, a multinational candy and gum giant – in his representation that the stock was worth $30.00 or more per share.

21.

As a result of Wrigley's representations – and without knowledge that he was perpetuating fraud against third-party investors – Plaintiffs received

company shares that were subject to taxation at the same rate as W-2 income and for an amount well above what Plaintiffs were actually being compensated.[1]

22.

Wrigley was well aware that vested shares and exercised options would have tax consequences that Plaintiffs would not have cash wages to satisfy.

23.

Unbeknownst to Plaintiffs, Wrigley was personally making false statements to investors.

24.

Wrigley leveraged his family name from the bubblegum business to make lofty promises about the anticipated success of the company, which he stated could "be bigger than [his father's and other ancestors'] the Wrigley company[.]"[2]

---

[1] Plaintiffs are stuck with consequences from W-2 income they never received while Wrigley's money in the company received and/or receives much more favorable tax treatment, and he has many options available to him to address his financial troubles caused by acquiring Surterra/Parallel. On the other hand, Plaintiffs are stuck with tax bills they never received wages to satisfy, and that tax debt is not dischargeable in bankruptcy.

[2] *See* Forbes, *Billionaire Beau Wrigley Says His Cannabis Company Will Be Bigger Than The Family Candy Business*, available at:
https://www.forbes.com/sites/willyakowicz/2021/02/10/billionaire-beau-wrigley-says-his-cannabis-company-will-be-bigger-than-the-family-candy-business/

25.

Stock market investors – including those who have reached agreements with Wrigley related to his fraudulent activities in connection with Surterra/Parallel – are well-aware that businessmen like Wrigley are gambling their money.

26.

Employees like Plaintiffs, however, had no idea that Wrigley was gambling with their compensation – they believed the billionaire would follow through on his promise to pay them the total value of the shares he warranted were worth $30.00 or more per share.

27.

Wrigley and his agents stated that the share values were based upon an audit that, upon information and belief, was never performed in good faith.

28.

Wrigley and his agents also took the position that shares and options were valued equally.

29.

Plaintiffs did not know that Wrigley was making lofty promises while also making false statements about the financial health of the company to investors related to, among other things, his efforts to raise capital.

30.

To raise needed capital, Wrigley falsely took the position that the company's shares were worth $30.00 or more per share.

31.

That false and inflated share value was then reported to the Internal Revenue Service ("IRS") and used to calculate Plaintiffs' taxable income.

32.

Wrigley represented to the IRS that the share value was more than $30.00 per share while knowing that –

(a)    He was making fraudulent statements as part of a Ponzi scheme to dupe investors to raise capital to fund the company and, ultimately, his SPAC plan; and

(b)    The shares (restricted stock units or "RSUs") were worthless and the equivalent of concrete boots that would immobilize employees with

tax consequences they could not afford (and cannot discharge in bankruptcy).

33.

While representing share values of $30.00 or more to the IRS and investors, Wrigley was offering to purchase some shares from select employees for $20.00 per share, which, at the time, Wrigley knew was also an inflated price as the shares were worthless and irreparably tainted by fraud and false statements.

34.

Wrigley represented or intimated to employees he was doing them a favor by purchasing shares for $20.00.

35.

Under Wrigley's fraudulent scheme, employees who received stock as wages or exercised options were reported to the IRS as having received the equivalent of cash or liquid wages for their shares, many at the rate of more than $30.00 per share.

36.

Wrigley spent a lot of time and money on compensation and benefits consultants and communications with employees about compensation packages

that benefited himself to the detriment of working-class employees, including Plaintiffs.

37.

When Wrigley targeted the company and took over, Plaintiffs were devoted to the company based on their interest in wellness.

38.

Wrigley was intimately involved in the daily operation of the company as well as the design and implementation of the fraudulent compensation schemes outlined above.

39.

At least one Plaintiff worked directly with Wrigley, who shared details about his personal life, personal motivations, and wealth, including his yacht which has its own informational DVD.

40.

Wrigley gave out informational DVDs about his yacht to multiple employees.

41.

Wrigley assured at least one Plaintiff directly that taking the company public and/or his successful exit from the company would cause the value of the shares to make Plaintiffs rich.

42.

Wrigley stated clearly that everyone would be rich based on his connections and network as long as they followed his directions.

43.

Wrigley engaged Stevens Sainte-Rose to attempt to convince employees to convert their RSUs into performance stock units ("PSUs") and/or accept PSUs as compensation, bonuses, or otherwise.

44.

In a Zoom meeting, Sainte-Rose and others sought to convince employees to shift their expectations from supposedly vested and valuable RSUs to undisputedly worthless and hypothetical PSUs.

45.

Wrigley and his agents also kept up with executives and other employees' performance and amounts of equity in a spreadsheet.

46.

Wrigley and agents on his behalf made false statements to Plaintiffs intended to claw back shares or saddle employees with tax consequences, depending on whether Wrigley deemed the person worthy of his assistance or deemed the cause deserving of his attention.

47.

Wrigley required at least one Plaintiff to exercise options.

48.

Of all the false statements that Wrigley made, the ones he made to the IRS about the share value continue to weigh Plaintiffs down with hundreds of thousands of dollars in tax liability.

49.

Plaintiffs paid over one hundred thousand dollars to accountants and attorneys who have been unable to unwind the disastrous financial consequences caused by Beau Wrigley.

50.

Plaintiffs also paid over one hundred thousand dollars to the company for the purpose, according to Wrigley, of covering the cost of the share-related tax liability.

## COUNT ONE

## 26 U.S.C. § 7434

51.

Wrigley filed, or caused an agent to file, fraudulent information returns with the IRS with respect to payments purported to be made to Plaintiffs.

52.

The returns provided to the IRS indicated that Plaintiffs were paid W-2 wages equal to the amount of their cash wages plus their number of shares multiplied by the fair market value as represented by Wrigley.

53.

Wrigley misrepresented the value of the shares to the IRS.

54.

By basing the W-2 wage calculation on the falsely stated value of shares, said wage information made up a fraudulent information return with respect to payments purported to be made to Plaintiffs.

55.

Wrigley knew at all times relevant that the shares were not the value that he directed his agents to report to the IRS.

56.

As a result, Wrigley is liable to Plaintiffs for their actual damages sustained as a proximate result of the filing of the fraudulent information return, costs of this action, and reasonable attorney's fees.

## COUNT TWO

### Violations of the Federal RICO Act

57.

To carry out his scheme to defraud Plaintiffs, Wrigley made false statements about Plaintiffs' compensation to the IRS and other governmental agencies for the purpose of obtaining money or property (in connection with, among other circumstances, efforts to fraudulently obtain third-party financing) by means of false or fraudulent pretenses and representations and by means of wire communication in interstate commerce in violation of 18 U.S.C. § 1343.

58.

Defendant has received income derived, directly or indirectly, from a pattern of racketeering activity described above.

59.

Plaintiffs have been injured by the racketeering activity described above in this Count.  As such, Plaintiffs are entitled to recover threefold the damages they sustained plus the cost of this lawsuit, including a reasonable attorney's fee.

## COUNT THREE

### Violations of the Georgia RICO Act

60.

To carry out his scheme to defraud Plaintiffs, Wrigley made false statements about Plaintiffs' compensation to the IRS and other governmental agencies for the purpose of obtaining money or property (in connection with, among other circumstances, efforts to fraudulently obtain third-party financing) by means of false or fraudulent pretenses and representations and by means of wire communication in interstate commerce in violation of 18 U.S.C. § 1343.

61.

Defendant has received income derived, directly or indirectly, from a pattern of racketeering activity described above.

62.

Serial violations of 18 U.S.C. § 1343 constitute racketeering activity under the Georgia RICO Act.  *See* O.C.G.A. § 16-14-3(5)(C).

63.

The violations of the Federal RICO Act at issue in this case necessarily constitute violations of the Georgia RICO Act, O.C.G.A. § 16-4-4, in that, in all regards relevant here, the Georgia RICO Act is more broadly applicable than its federal counterpart.

64.

Plaintiffs have been injured by the racketeering activity described above in this Count.  As such, Plaintiffs are entitled to recover three times the actual damages they sustained plus punitive damages.  O.C.G.A. § 16-14-6(c).

## COUNT FOUR

Breach of Fiduciary Duty

65.

Wrigley was so situated as to exercise a controlling influence over the will, conduct, and interest of Plaintiffs, including in the context of their compensation and willingness to believe his representations about the value and projection of

the company, that a confidential and fiduciary relationship was established.  *See*

O.C.G.A. § 23-2-58.

66.

Wrigley was intimately involved in the development of the fraudulent

compensation packages that he peddled to Plaintiffs that he knew would cause tax

consequences that they did not have the ability to pay and/or that he knew were

worthless.

67.

Wrigley's unusual direct and personal involvement in the company and, in

particular, Plaintiffs' compensation packages created a confidential and fiduciary

relationship with Plaintiffs and Wrigley.

68.

Wrigley knowingly exacerbated Plaintiffs' financial burden described above

by falsely reporting to the IRS that the value per share was $30.00 or more.

69.

Wrigley made the false report of value to the IRS as noted above because

doing so perpetuated the fraud against third-party investors, which Wrigley

believed was necessary to accomplish the SPAC and give himself a successful exit

from the company.

70.

Wrigley was painfully aware that the $30.00 per share value was false because, at the time he was communicating that share price to the IRS, he was offering to purchase shares from select employees for $20.00 per share, which he stated that he considered to be generous and a favor.

71.

Wrigley breached his fiduciary duty to Plaintiffs by engaging in the conduct outlined in this count.

## COUNT FIVE

Fraud

72.

Wrigley falsely represented to Plaintiffs that they would be compensated at a particular rate.

73.

Plaintiffs were not compensated at the rate represented by Wrigley, even though some Plaintiffs left other, higher-paying employment in reliance on Wrigley's compensation promises.

74.

Plaintiffs also were not made rich or financially benefited as promised by Wrigley.

75.

Plaintiffs relied on Wrigley's misrepresentations in connection with their agreement to accept transfers of shares for any reason (including accepting them as compensation or as a bonus).

76.

Although Plaintiffs were not compensated at the rate promised by Wrigley, they were taxed by the IRS as though they were compensated at that rate.

77.

Reliance on Wrigley's false representations caused Plaintiffs substantial harm in the form of substantial tax liabilities on worthless promises and the inability to continue to work for a once-promising legal cannabis start-up.

78.

The conduct alleged in this count amounts to common law fraud.

## COUNT SIX

### Deceit and Misrepresentations

79.

Wrigley falsely represented to Plaintiffs that they would be compensated at a particular rate.

80.

Plaintiffs were not compensated at the rate represented by Wrigley, even though some Plaintiffs left other, higher-paying employment in reliance on Wrigley's compensation promises.

81.

Plaintiffs also were not made rich or financially benefited as promised by Wrigley.

82.

Plaintiffs relied on Wrigley's misrepresentations in connection with their agreement to accept transfers of shares for any reason (including accepting them as compensation or as a bonus).

83.

Although Plaintiffs were not compensated at the rate promised by Wrigley, they were taxed by the IRS as though they were compensated at that rate.

84.

Reliance on Wrigley's false representations caused Plaintiffs substantial harm in the form of substantial tax liabilities on worthless promises and the inability to continue to work for a once-promising legal cannabis start-up.

85.

The conduct alleged in this count amounts to a violation of O.C.G.A. § 51-6-2.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a TRIAL BY JURY and the following relief:

(a)   Full amount of financial losses caused to Plaintiffs as a result of Defendant's fraudulent scheme;

(b)   Compensatory damages in an amount to be determined by the enlightened conscience of the jury for Plaintiffs' emotional distress, worry, suffering, inconvenience, mental anguish, loss of enjoyment of life, and special damages;

(c)   Threefold damages sustained by Plaintiffs pursuant to federal and Georgia RICO statutes;

(d)   Award of costs and expenses of this action, together with reasonable attorney and expert fees;

(e)     Punitive damages in an amount to be determined by the enlightened conscience of the jury sufficient to punish Defendant for his conduct toward Plaintiffs and deter Defendant from similar conduct in the future;

(f)     Judgment against Defendant for damages incurred by Plaintiffs;

(g)     Judgment against Defendant in an amount to fully and adequately compensate Plaintiffs;

(h)     An award of pre-judgment and post-judgment interest;

(i)     A trial by jury on all issues triable to a jury; and

(j)     Other and further relief as the Court deems just and proper.

Respectfully submitted this 4th day of November 2024.


By:     /s/ Douglas H. Dean
        Georgia Bar No. 130988
        Attorney for Plaintiffs
        Dean Thaxton, LLC
        601 E. 14th Avenue (31015)
        Post Office Box 5005
        Cordele, Georgia 31010
        T:  (229) 271-9323
        F:  (229) 271-9324
        E:  *doug@deanthaxton.law*